PRECEDENTIAL

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

No. 20-2084
_____

T.R., a minor, individually, by and through her parent,
Barbara Galarza, and on behalf of all others similarly
situated; BARBARA GALARZA, individually, and on behalf
of all others similarly situated; A.G., a minor, individually, by
and through his parent, Margarita Peralta, and on behalf of all
others similarly situated; MARGARITA PERALTA,
individually, and on behalf of all others similarly situated;
L.R.; D.R., a minor, individually, by and through her parent,
Madeline Perez, and on behalf of all others similarly situated;
J.R.; MADELINE PEREZ, individually, and on behalf of all
others similarly situated; R.H., a minor, individually, by and
through his parent, Manqing Lin, and on behalf of all others
similarly situated; MANQING LIN, individually, and on
behalf of all others similarly situated

v.

SCHOOL DISTRICT OF PHILADELPHIA


L.R., D.R. and their mother, Madeline Perez, and R.H. and

his mother Manqing Lin,
Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-15-cv-04782
District Judge:  The Honorable Mitchell S. Goldberg

_____

Argued January 20, 2021

Before: SMITH, *Chief Judge*, HARDIMAN and ROTH,
*Circuit Judges*

(Filed July 9, 2021)

Chanda A. Miller
Paul H. Saint-Antoine          [ARGUED]
FAEGRE DRINKER BIDDLE & REATH
One Logan Square
Suite 2000
Philadelphia, PA 19103

Michael Churchill
Claudia De Palma
PUBLIC INTEREST LAW CENTER OF PHILADELPHIA
1500 John F. Kennedy Boulevard

-2-

Two Penn Center, Suite 802
Philadelphia, PA 19103

Maura I. McInerney
Margaret M. Wakelin
EDUCATION LAW CENTER
1800 John F. Kennedy Boulevard
Suite 1900
Philadelphia, PA 19103
*Counsel for Appellants*

Danielle M. Goebel          [ARGUED]
Katherine V. Hartman
Marjorie M. Obod          [ARGUED]
DILWORTH PAXSON
1500 Market Street
Suite 3500 E
Philadelphia, PA 19103
*Counsel for Appellee*

Richard Salgado
JONES DAY
2727 North Harwood Street
Dallas, TX 75201

Carter G. Phillips
SIDLEY AUSTIN
1501 K Street, N.W.
Washington, D.C. 20005

Catherine M. Reisman
REISMAN CAROLLA GRAN & ZUBA
19 Chestnut Street
Haddonfield, NJ 08033

Ellen M. Saideman
7 Henry Drive
Barrington, RI 02806
*Counsel for Amici Appellants*

————————————————

OPINION OF THE COURT
————————————————

SMITH, *Chief Judge*.

Appellant-Plaintiffs brought a putative class action against the School District of Philadelphia claiming shortcomings in the School District's translation and interpretation services that purportedly amount to a violation of the Individuals with Disabilities Education Act ("IDEA"). The IDEA seeks to ensure that the *unique* needs of each child in special education are provided for in accordance with *individualized* education plans. Plaintiffs appeal both an order denying their class certification motion and a summary judgment order wherein the District Court declined to find that Plaintiffs met a systemic exception to IDEA's administrative exhaustion requirement.

For the reasons set forth below, we will affirm.

## I. INDIVIDUALS WITH DISABILITIES EDUCATION ACT

### A. Procedural Safeguards

The Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, is a statute that offers federal funding to States for the education of children with disabilities. *See, e.g.*, *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). "In exchange for the funds, a State pledges to comply with a number of statutory conditions." *Id.* The primary condition is that the participating State provide a "free appropriate public education," or "FAPE," to all eligible children. *Id.* (citing § 1412(a)(1)). The IDEA does not mandate what a FAPE must substantively include beyond a few basic minima, most obviously that the education be provided under public supervision and without charge. *See* § 1401(9)(A) (partial definition of FAPE). The substance of a FAPE is primarily defined to be such "special education and related services" that "are provided in conformity with [a child's] individualized education program," or "IEP." § 1401(9)(D); *see also* § 1414(d)(1)(A) (defining IEP); § 1401(29) (defining special education); *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017) (apologizing for this "acronymic world").

The IEP is the "centerpiece" of the IDEA and the "primary vehicle" for implementing the congressional policy underlying the Act. *Honig v. Doe*, 484 U.S. 305, 311 (1988). An "IEP

-5-

documents the child's current 'levels of academic achievement,' specifies 'measurable annual goals' for how she can 'make progress in the general education curriculum,' and lists the 'special education and related services' to be provided so that she can 'advance appropriately toward [those] goals.'" *Fry*, 137 S. Ct. at 749 (alteration in original) (quoting § 1414(d)(1)(A)(i)(I), (II), (IV)(aa)). In requiring individualized education programs, the "IDEA operates from the premise that each child will have unique disabilities and presumes that each program will be personalized." *Blackman v. District of Columbia*, 633 F.3d 1088, 1094 (D.C. Cir. 2011) (Brown, J., concurring). Reinforcing the personalized nature of special education, each child's IEP is created by the child's "IEP Team," which consists of the child's parents, at least one "regular education teacher" of the child ("if the child is, or may be, participating in the regular education environment"), and certain other persons. § 1414(d)(1)(B). "[P]arents play[] a 'significant role'" in the process of creating an IEP. *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007) (quoting *Schaffer v. Weast*, 546 U.S. 49, 53 (2005)).

So that parents' participation in the IEP process is assured, the IDEA requires that state educational agencies establish certain procedural safeguards. *See* 20 U.S.C. § 1415(a). One procedural safeguard mandated by the IDEA is that an educational agency give parents "[w]ritten prior notice" whenever the agency proposes to change, or refuses to change, the provisions of a child's IEP. § 1415(b)(3); 34 C.F.R. § 300.503(a) (parroting statute). In Pennsylvania, this notice

is called a Notice of Recommended Educational Placement/Prior Written Notice ("NOREP/PWN"). This notice must be given "in the native language of the parents, unless it clearly is not feasible to do so." 20 U.S.C. § 1415(b)(4); *see also* 34 C.F.R. § 300.503(c)(1)(ii) (parroting statute).

The implementing regulations also mandate certain procedural safeguards for parents at IEP Team meetings. "The public agency must give the parent a copy of the child's IEP at no cost to the parent." 34 C.F.R. § 300.322(f) (regulation on "Parent participation" for IEP Team meetings). Further, educational agencies must take "whatever action is necessary" to allow parents to understand IEP Team meetings, "including arranging for an interpreter." *Id.* § 300.322(e). There is, however, no regulation explicitly mandating that IEPs or draft IEPs be translated into the parent's native language.

These procedural safeguards would, of course, be of limited value if parents were unaware of the rights that the safeguards afford. So the IDEA requires that an explanation and copy of the procedural safeguards be given to parents at least once a year. 20 U.S.C. § 1415(d)(1)(A); 34 C.F.R. § 300.504(a). In Pennsylvania, this explanation is called the Procedural Safeguards Notice. The explanation and copy of the procedural safeguards must be provided in the parent's native language "unless it clearly is not feasible to do so." 20 U.S.C. § 1415(d)(2); 34 C.F.R. § 300.504(d).

"[T]he importance Congress attached to these procedural

safeguards cannot be gainsaid. . . . Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation . . . as it did upon the measurement of the resulting IEP against a substantive standard." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205–06 (1982); *see also, e.g.*, *H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch.*, 873 F.3d 406, 413 (3d Cir. 2017) (holding that vindication of procedural rights under IDEA makes a party a prevailing party for purpose of attorneys' fees). However, the IDEA provides relief only for the denial of a FAPE, not for the denial of a procedural right. *Cf. Fry*, 137 S. Ct. at 755 ("[T]he only relief the IDEA makes available is relief for the denial of a FAPE." (internal quotations omitted)).

Congress addressed this oddity in a 2004 amendment to the IDEA which provides that a procedural violation can rise to the level of a deprivation of a FAPE when the procedural violation either:

> (I) impeded the child's right to a free appropriate public education;
>
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
>
> (III) caused a deprivation of educational benefits.

Pub. L. No. 108-446, sec. 101, § 615(f)(3)(E)(ii), 118 Stat. 2647, 2722 (2004) (codified at 20 U.S.C. § 1415(f)(3)(E)(ii)); 34 C.F.R. § 300.513(a)(2) (parroting statute); *see, e.g.*, *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66–67 (3d Cir. 2010); *see also* Jon Romberg, *The Means Justify the Ends: Structural Due Process in Special Education Law*, 48 Harv. J. on Legis. 415, 439–42 (2011) (describing history of § 1415(f)(3)(E)). As shorthand, we will refer to the second type of procedural violation as a denial of a parent's right to "meaningful participation." *Cf., e.g.*, 20 U.S.C. § 1400(c)(5)(B) (finding of Congress that "the education of children with disabilities can be made more effective by . . . ensuring that families . . . have meaningful opportunities to participate"); *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010) (finding no actionable procedural violation because parents "had an opportunity to participate meaningfully in the creation of an IEP").

## B.  Administrative Exhaustion Requirement

The IDEA establishes a detailed administrative mechanism for resolving disputes about whether an educational agency has complied with the IDEA.  *See* 20 U.S.C. § 1415.  This mechanism includes procedures for the filing of complaints (*see* § 1415(b)(6)–(7)), mediation (§ 1415(e)), impartial due process hearings conducted by a hearing officer (§ 1415(f)), and appeals of hearing officer findings to the state educational agency (§ 1415(g)).  The IDEA also provides that after these administrative proceedings have concluded, an aggrieved party may bring a civil action in a state court or United States district

court. § 1415(i)(2). This detailed statutory regime makes it "clear . . . that Congress intended plaintiffs to complete the administrative process before resorting to federal court." *Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994) (citing *Smith v. Robinson*, 468 U.S. 992, 1011–12 (1984)).

Despite the IDEA's administrative exhaustion requirement, our Court has acknowledged that a plaintiff's failure to exhaust may be excused "where: (1) exhaustion would be futile or inadequate; (2) the issue presented is purely a legal question; (3) the administrative agency cannot grant relief; [or] (4) exhaustion would cause severe or irreparable harm." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 275 (3d Cir. 2014) (citing *Komninos*, 13 F.3d at 778) (analyzing futility exception). "Absent the existence of any of those exceptions, failure to exhaust will deprive a federal court of subject matter jurisdiction." *Id.* We have also stated that exhaustion is not required where plaintiffs "allege systemic legal deficiencies and, correspondingly, request system-wide relief that cannot be provided (or even addressed) through the administrative process." *Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80, 89 (3d Cir. 1996). Yet we have suggested that this exception—we will call it the "systemic exception"—"merely flows implicitly from, or is in fact subsumed by, the futility and no-administrative-relief exceptions." *Id.* (remanding to district court to determine whether plaintiffs' claim fell within any recognized exception to exhaustion).

The reach of IDEA's exhaustion requirement extends

-10-

beyond claims brought under the IDEA. Section 1415(*l*) requires administrative exhaustion of any claims that "seek[] relief that is also available" under the IDEA. 20 U.S.C. § 1415(*l*). Of course, the IDEA is not the only statute protecting the interests of schoolchildren with disabilities and their parents. *See Fry*, 137 S. Ct. at 749. For example, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, forbids any "public entity" from discriminating on the basis of disability and "requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' to avoid such discrimination." *Fry*, 137 S. Ct. at 749 (quoting 28 C.F.R. § 35.130(b)(7)). Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides similar protections. *Id.* The Equal Educational Opportunities Act ("EEOA") requires state educational agencies to "take appropriate action to overcome language barriers that impede equal participation by its students." 20 U.S.C. § 1703(f). And Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of national origin in federally funded programs. *See* 42 U.S.C. § 2000d.

A central exhaustion question then is how to determine whether a non-IDEA claim "seek[s] relief that is also available" under the IDEA. In *Fry*, the Supreme Court held that "a court should look to the substance, or gravamen of the plaintiff's complaint." 137 S. Ct. at 752. As to how a court should determine whether the gravamen of a complaint concerns the denial of a FAPE, the Supreme Court provided "[o]ne clue"—consisting of two counterfactual questions—

and one "sign." *Id.* at 756. The two questions are:

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?

*Id.* ("When the answer to those questions is yes, a complaint" is likely not for the denial of FAPE). The "sign" that the gravamen of a complaint concerns the denial of a FAPE will appear in the procedural history: "A plaintiff's initial choice to pursue [the administrative] process may suggest that she is indeed seeking relief for the denial of a FAPE—with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospect of such a remedy." *Id.*; *see also Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 131–36 (3d Cir. 2017) (applying *Fry* framework).

## II. BACKGROUND FACTS AND PROCEDURAL HISTORY

Because we are reviewing the District Court's grant of summary judgment in favor of the School District, we examine the factual background, drawn from evidence in the record, in the light most favorable to Plaintiffs. *See, e.g.*, *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 176 (3d Cir. 2019).

## A. The School District of Philadelphia

The School District of Philadelphia oversees hundreds of public schools providing educational programs to hundreds of thousands of enrolled students. Given the size and diversity of such enrollment, there are, unsurprisingly, some enrolled students within the School District—and parents of enrolled students—who have limited English proficiency ("LEP"), meaning English is not their primary language so that they have a "limited ability to read, write, speak, or understand English." *T.R. v. Sch. Dist. of Phila.* (*Class Cert. Op.*), No. 15-cv-04782, 2019 WL 1745737, at *8 (E.D. Pa. Apr. 18, 2019) (citing, *inter alia*, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41455, 41457 (June 18, 2002)). School District records from 2013 show that there were approximately 25,900 families of enrolled students whose primary home language was not English and 19,670 families who had expressly requested documents from the School District in a language other than English. *Id.* at *1.

The School District's Office of Family and Community Engagement ("FACE") provides translation and interpretation services to support LEP parents. *See T.R. v. Sch. Dist. of Phila.* (*Summary Judgment Op.*), 458 F. Supp. 3d 274, 279 (E.D. Pa. 2020). Some general, standard documents—like the School District's attendance policy—are translated into common languages and made publicly available on the school's website. At the school level, School District employees can request that

-13-

translation or interpretation services be provided by a Bilingual Counseling Assistant ("BCA"), either through FACE or directly from a BCA. Employees can have a BCA translate day-to-day communications, like permission slips, or have a BCA provide live interpretation at meetings, like report card conferences. However, "the demand for interpreters often exceeds the number of staff available" so that "not all employee requests for translation are fulfilled." *Id.* School District employees can also call and request interpretation services from the Language Line—a telephonic interpretation service.

Translation and interpretation services are necessary to support LEP parents of enrolled students with disabilities. As of November 2013, the School District reported that 1,500 LEP students were receiving special education and that there were 1,887 students with IEPs whose primary home language was something other than English. *Class Cert. Op.*, 2019 WL 1745737, at *10. Records also indicated that in the 2015–2016 and 2016–2017 school years there were, respectively, 3,507 and 3,782 special education students whose primary home language was not English. *Id.*

## B. Plaintiffs

In August 2015, Margarita Peralta and her ward, A.G, and Barbara Galarza and her child, T.R.—the Original Plaintiffs—filed a complaint against the School District. Importantly, A.G. and T.R. had exhausted administrative remedies and received decisions from a due process hearing officer. After

-14-

the hearing officer had found that Ms. Peralta and Ms. Galarza were each "denied meaningful parental participation," he awarded compensatory education to A.G. and T.R. In their District Court complaint, Original Plaintiffs sought additional declaratory and injunctive relief against the School District as described *infra* Section II.C.

In April 2017, Original Plaintiffs amended the complaint to include additional plaintiffs—Madeline Perez and her children and Manqing Lin and her child. Subsequently, Original Plaintiffs dismissed their claims against the School District with prejudice, leaving only the plaintiff-appellants who bring this appeal. We will summarize the pertinent facts relating to these remaining Plaintiffs.

### 1. Madeline Perez and her children, L.R. and D.R.

Madeline Perez is the mother of three children with disabilities, two of whom are still named plaintiffs in this case—L.R. and D.R. Ms. Perez is LEP and speaks Spanish. "[W]hile there have been issues as to which Ms. Perez and the District collaborated [regarding the appropriate placements and service for her children], there have also been many occasions on which Ms. Perez has not fully understood educational issues relating to her children due to lack of adequate interpretation services." JA1384[1] (Plaintiffs' Response to School District's Statement of Undisputed Facts ¶ 41). Ms. Perez believes she would "be able to contribute

---

[1] Citations preceded by "JA" are to the parties' Joint Appendix.

more fully [at IEP Team Meetings] if she received translated IEPs" and other documents. *Id.* (¶ 40).

As to the claims in the operative complaint, Ms. Perez and her children have not exhausted their administrative remedies.

### 2. *Manqing Lin and her child, R.H.*

Manqing Lin is the mother of one child with disabilities in the School District—R.H. "Although Ms. Lin is able to understand and speak some English words, she has limited English proficiency and speaks only Mandarin at home with R.H.'s father and their children." JA1399 (Plaintiffs' Statement of Additional Facts ¶ 64). Ms. Lin has provided input and changes to R.H.'s IEP. However, her ability to provide input at IEP Team meetings is hampered by the fact that the School District does not provide her with translated *draft* IEPs or other IEP-related documents before meetings.

Prior to joining this litigation, Ms. Lin requested mediation through Pennsylvania's Office for Dispute Resolution and ultimately reached an agreement with the School District. In that mediation agreement, the School District agreed to provide translated *final* IEPs and some IEP-related evaluation reports. The School District also "provides Ms. Lin with access to a BCA and the school's Special Education Liaison to review the draft documents in advance of the [IEP Team] meetings," but, even after the IEP Team meetings, Ms. Lin remained unable to fully understand the reports on R.H. provided by the School District, partly because the interpreter did not understand

-16-

special education terminology. JA1379–80 (Plaintiffs' Response to School District's Statement of Undisputed Facts ¶ 33).

Like Ms. Perez and her children, Ms. Lin and R.H. have not exhausted their administrative remedies.

## C. Complaint and Motion to Dismiss

The operative complaint is styled as a "Class Action Complaint" brought by the Plaintiffs on behalf of all similarly situated individuals.[2] It contains seven counts, six of which are before us.[3] Count One alleges a violation of the IDEA for "Failure to Provide Meaningful Parental and Student Participation." JA355. Counts Three through Five allege violations of other federal statutes—the Rehabilitation Act, ADA, EEOA, and Title VI of the Civil Rights Act—and a chapter of the Pennsylvania Code. The remaining counts allege violations of chapters of the Pennsylvania Code for failure to completely and timely translate certain "IEP process documents," including IEPs, NOREP/PWNs, and Procedural Safeguard Notices (Count Six), and "regular education forms"

---

[2] Two classes are defined: the "Parent Class" consisting of all LEP parents of children with disabilities who are now or in the future will be enrolled in the School District, and the "Student Class" consisting of all the children of such parents regardless of the child's English proficiency. JA1154–55 (Motion for Class Certification).

[3] Count Two was voluntarily dismissed with prejudice.

(Count Seven).  JA362–63.

The complaint alleges that the School District "has adopted a systemic policy of failing to provide sufficient interpretation services and to timely and completely translate IEP process documents and regular education forms."  JA343–44 (Compl. ¶ 60).  While the complaint acknowledges that the School District has provided some translation services at IEP Team meetings, it asserts that the School District's "incomplete, inconsistent effort has not and cannot facilitate the requisite meaningful parent participation."  JA345 (Compl. ¶ 67).

As for relief, the complaint requests, *inter alia*, that the District Court "Order that the [School] District adopt and implement a new written special education plan and [School] District policy to provide legally mandated translation and sufficient interpretation services to members" of the classes and "Order that the [School] District timely translate and deliver all IEP process documents to all members of the Parent Class and the Student Class as needed in the appropriate native language in advance of IEP meetings to ensure meaningful participation."  JA363.  The Plaintiffs do not seek individualized damages or remedies for L.R., D.R., or R.H.

The School District moved to dismiss the original complaint—while T.R. and A.G. were still plaintiffs—under Federal Rule of Civil Procedure 12(b)(1), arguing that absent class members failed to exhaust administrative remedies.[4]  The

---

[4] The School District also sought dismissal under Rule 12(b)(6)

-18-

School District posited that the putative class members were not excused from the IDEA's exhaustion requirement "because the Complaint does not adequately allege a systemic legal deficiency." *T.R. v. Sch. Dist. of Phila.*, 223 F. Supp. 3d 321, 329 (E.D. Pa. 2016). The District Court rejected that argument and denied the motion to dismiss, concluding that the complaint alleges a "systemic legal deficiency—namely, the insufficient and untimely provision of interpretation and translation services." *Id.* at 330. However, the Court made clear that it was "certainly possible that a developed record may not establish Plaintiffs' systemic legal deficiency theory." *Id.*

### D. Denial of Motion for Class Certification

In August 2018, Plaintiffs filed a motion for class certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). In April 2019, the District Court denied Plaintiffs' motion for class certification. *Class Cert. Op.*, 2019 WL 1745737. Although the District Court rejected the School District's challenges to the proposed class definitions, the Court found that Plaintiffs did not meet their burden of establishing both numerosity and commonality under Rule 23(a).[5] *Id.* at \*9–\*17. Most relevant for our purposes is the

for failure to state a claim.

[5] The District Court also found that Plaintiffs did not satisfy the implicit cohesiveness requirement of Rule 23(b)(2) because "the concept of 'meaningful participation' is highly fact-intensive and, thus, is not conducive to issuing any one remedy

-19-

Court's treatment of commonality.

The District Court determined that "the legal crux of this matter does not turn on any statutory or regulatory mandate that the School District provide translation and interpretation services in connection with the provision of special education services." *Id.* at *14. "Rather, the statutory mandate at issue here . . . is the requirement that the School District provide enough language services to allow for 'meaningful participation' by parents." *Id*. This focus on "meaningful participation" made a determination of commonality impossible, the Court explained, "because there are varying circumstances that could affect whether the particular services provided by the School District were enough or were insufficient to satisfy the right of meaningful participation." *Id.* at *16.

Furthermore, the District Court determined that "the School District provides significant discretion to the relevant child-study personnel . . . to engage parents and provide appropriate language services." *Id.* at *17. "[D]iscretion is necessary to

that would ensure meaningful participation." *Class Cert. Op.*, 2019 WL 1745737, at *22. *See generally, e.g.*, *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011) ("[I]t is well established that the class claims must be cohesive. . . . The disparate factual circumstances of class members may prevent a class from being cohesive and, therefore, make the class unable to be certified under Rule 23(b)(2)." (internal citations and quotations omitted)).

ensure that limited English proficient parents are given the tools they need to participate without, for example, taking the unnecessary steps of translating documents for parents who are unable to read proficiently or for whom written translation of a complex document would be overwhelming." *Id.* Thus, Plaintiffs did not actually "challenge a centralized policy enforced by a single decision-maker, but rather target[ed] individualized decisions by various case supervisors, school principals, and teachers as to what services are required in each particular case." *Id.*

Plaintiffs timely appealed the District Court's order denying their motion for class certification.[6]

### E. Grant of School District's Motion for Summary Judgment

On April 30, 2020, the District Court granted the School District's motion and entered judgment in its favor on the grounds that Plaintiffs failed to exhaust administrative remedies. Plaintiffs admitted that they had not exhausted administrative remedies but argued that their claims fell within the futility exception to exhaustion because they had

---

[6] Prior to the District Court's order granting the School District's motion for summary judgment, Plaintiffs petitioned for leave to appeal the class certification order under Rule 23(f). *See* Petition, No. 19-8014 (3d Cir. May 2, 2019). Our Court denied the petition. *See* Order, No. 19-8014 (3d Cir. July 11, 2019).

challenged systemic legal deficiencies. "In particular, . . . an administrative process would be futile because the hearing officer cannot and does not have the authority to award Plaintiffs' requested relief by ensuring . . . changes to the District's language services' policies and practices." JA1343–44 (Plaintiffs Br. Opposing Summ. J.).

The District Court rejected Plaintiffs' argument. At the outset, the Court remarked that "the commonality requirement of Fed. Rule Civ. P. 23(a) and the systemic exception to the exhaustion requirement often go hand in hand" and recited much of its earlier analysis on Rule 23 commonality. *Summary Judgment Op.*, 458 F. Supp. 3d at 286, 288–90. The Court then reasoned that after the denial of class certification, Plaintiffs "can only seek relief for the two parent Plaintiffs and their children." *Id.* at 290. Ultimately, Plaintiffs did not satisfy a systemic exception to the IDEA exhaustion requirement because "their claims actually focus on the shortcomings of a particular component of the School District's translation/interpretation services" and "do not rise to a truly systemic level in the sense that IDEA's basic goals are threatened on a system-wide basis." *Id.*

As to the remaining non-IDEA claims—under Section 504 of the Rehabilitation Act, the ADA, the EEOA, Title VI of the Civil Rights Act, and Pennsylvania law—the District Court applied *Fry*'s test and determined that the gravamen of all the non-IDEA claims was the denial of a FAPE. Thus, the non-IDEA claims were subject to the IDEA's exhaustion requirement and because Plaintiffs failed to exhaust

-22-

administrative remedies or satisfy an exception to exhaustion, the Court granted the motion and entered judgment in favor of the School District on the entirety of the complaint.

Plaintiffs appealed the order granting summary judgment.

### III. JURISDICTION AND STANDARD OF REVIEW

Plaintiffs invoked federal question jurisdiction pursuant to 28 U.S.C. § 1331 for their claims under the IDEA and other federal statutes and invoked supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for their state law claims. We have held that exhaustion of administrative remedies is a requirement for a district court to exercise subject matter jurisdiction over an IDEA claim. *See Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 271–72 (3d Cir. 2014). While we later expressed "some doubts as to whether IDEA exhaustion is a jurisdictional requirement, we are bound by this precedent" and, in any event, we need not address whether exhaustion is jurisdictional because the School District preserved its exhaustion argument. *Wellman*, 877 F.3d at 130 & n.6. Our Court has appellate jurisdiction over an appeal from a final judgment under 28 U.S.C. § 1291.

We review a grant of summary judgment *de novo*. *See*, *e.g.*, *Matheis*, 936 F.3d at 176. We apply the same test as the District Court, reviewing the facts in the light most favorable to the non-movant—here, Plaintiffs—and granting summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

-23-

judgment as a matter of law." *Id.* (quoting Fed. Rule Civ. P. 56(a)).

**IV. ANALYSIS**

The parties spend the bulk of their briefing discussing the District Court's denial of class certification and the numerosity and commonality requirements of Rule 23. But Rule 23 is a procedural device that cannot be interpreted to "abridge, enlarge or modify any substantive right." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (quoting 28 U.S.C. § 2072(b)). The threshold question then is whether the District Court erred in granting summary judgment in favor of the School District as to the claims of the individual Plaintiffs. Because we conclude for the reasons set forth below that the Court did not err in granting summary judgment—for both the IDEA claim and the non-IDEA claims—we need not address the class certification issues. *See, e.g.*, *Hennessy v. FDIC*, 58 F.3d 908, 924 (3d Cir. 1995).

**A. IDEA Claim**

*1. Individualization and exhaustion*

The Individuals with Disabilities Education Act assures that educational services provided for children with disabilities be individualized in nature.[7] As the Supreme Court in *Rowley*

_____

[7] In 1990, Congress changed the name of the Education of the Handicapped Act to the Individuals with Disabilities Education

-24-

noted, "[n]oticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children." 458 U.S. at 190. Instead, Congress "set forth extensive procedures to be followed in formulating *personalized* educational programs for handicapped children." *Id.* at 194 (emphasis added). Each child has an IEP Team responsible for creating the child's IEP. And a FAPE is defined as the "special education and related services that . . . are provided in conformity" with a child's personalized IEP. 20 U.S.C. § 1401(9). "Special education" is in turn defined as "*specially designed* instruction, at no cost to parents, to meet the *unique needs* of a child with a disability. . . ." § 1401(29) (emphases added). In sum, the "IDEA operates from the premise that each child will have unique disabilities and presumes that each program will be personalized." *Blackman*, 633 F.3d at 1094 (Brown, J., concurring).

The IDEA's focus on the individual also underlies its exhaustion requirement. Addressing the educational needs of children with disabilities requires individualized assessments and considerations of countless concerns. The administrative dispute mechanism of § 1415 sets out an interactive process between parents and local school officials to address such circumstances. "No federal district court . . . can duplicate that process." *Robinson*, 468 U.S. at 1012. When compared to

Act. *See* Pub. L. No. 101-476, 104 Stat. 1141; *see also Batchelor*, 759 F.3d at 271 n.7.

-25-

courts, "teachers and parents, school districts, and administrative review boards are closest to the issues at hand, and therefore they are the best persons or entities to address individual concerns and complaints." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 299 (3d Cir. 2014). Allowing children or parents "to go directly to court . . . would . . . run counter to Congress' view that the needs of handicapped children are best accommodated by having the parents and the local education agency work together to formulate an individualized plan for each handicapped child's education." *Smith*, 468 U.S. at 1011–12.

### 2. *Systemic exception to exhaustion*

Against this backdrop, we turn to the systemic exception to exhaustion. In *Beth V. by Yvonne V. v. Carroll*, our Court stated that we viewed allegations of systemic legal deficiencies as a traditional basis for excusing the IDEA's exhaustion requirement. *See* 87 F.3d 80, 89 (3d Cir. 1996). But we had no need in *Beth V.* to address the contours of any systemic exception, and since then we have not discussed the systemic exception in a precedential opinion. *See generally J.T. v. Dumont Pub. Schs.*, 533 F. App'x 44, 54 (3d Cir. 2013) (not precedential). We draw, then, upon principles of IDEA exhaustion already formulated by other courts as we seek to give some shape to the scope of the systemic exception.

As an initial matter, the fact that a complaint "is structured as a class action seeking injunctive relief, without more, does not excuse exhaustion." *Hoeft v. Tucson Unified Sch. Dist.*,

-26-

967 F.2d 1298, 1308 (9th Cir. 1992) (describing futility or inadequacy exception to exhaustion requirement). Relatedly, the systemic exception is not met every time a plaintiff challenges centralized, uniform policies that affect all students within a school or school district. *See Hoeft*, 967 F.2d at 1304; *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1044 (10th Cir. 1993). Instead, to satisfy the systemic exception, a plaintiff must challenge policies that are "truly systemic . . . in the sense that the IDEA's basic goals are threatened on a system-wide basis" and must not "focus[] on the shortcomings of a particular component of . . . special education." *Hoeft*, 967 F.2d at 1305; *see also Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 27–28 (1st Cir. 2019) (determining that plaintiffs did not allege truly systemic failures and declining to decide whether to recognize systemic exception to IDEA's exhaustion requirement).

Claims that *do* meet the systemic exception often challenge policies that concern the administrative dispute-resolution mechanism itself. *See Hoeft*, 967 F.2d at 1309 ("Exhaustion may also be excused because of inadequacy of administrative remedies where the plaintiffs' substantive claims themselves concern the adequacy of the administrative process."). Given the congressional policies animating the exhaustion requirement and the superiority of local problem-solving, it is not surprising that the systemic exception to exhaustion is largely limited to those procedural violations that "effectively deprive[] plaintiffs of an administrative forum." *Id.* at 1305; *cf.* John Hart Ely, Democracy and Distrust: A Theory of

Judicial Review 75–77 (1980) (justifying judicial intervention where courts must "make sure the channels of political participation and communication are kept open").

For example, in *Mrs. W. v. Tirozzi*—which our Court in *Beth V.* relied upon when recognizing the systemic exception—the "Plaintiffs' complaint allege[d] that the defendants[] fail[ed] to make bona fide attempts to resolve their complaints against the Bridgeport Board of Education and the Connecticut Department of Children and Youth Services and to implement fully and conduct an informal [complaint resolution procedure]." 832 F.2d 748, 752 (2d Cir. 1987). Other cases out of the Second Circuit similarly share the "common element" that "plaintiffs' problems could not have been remedied by administrative bodies because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process." *J.S. v. Attica Cent. Sch.*, 386 F.3d 107, 113–14 (2d Cir. 2004) (collecting cases).

The takeaway from this jurisprudence is that the systemic exception applies when plaintiffs challenge policies that threaten basic IDEA goals—not mere components of special education programs—including policies that undermine the framework of the administrative hearing process. With that in mind, we consider whether Plaintiffs' claims satisfy the systemic exception.

-28-

### 3. Plaintiffs do not meet the systemic exception

In Plaintiffs' own words, "[i]t is undisputed that the [School] District provides some translation and interpretation services to LEP parents; Plaintiffs dispute the adequacy of the quantity, quality, and consistency of those services resulting from the [School] District's policies and practices." JA1367 (Plaintiffs' Response to School District's Statement of Undisputed Facts ¶ 16). By its terms, such a challenge does not meet the requirements of the systemic exception.

Although the parental right of meaningful participation could rightly be called a "basic goal" of the IDEA, the provision of translation and interpretation services is only one component of ensuring meaningful participation. *See, e.g.*, 34 C.F.R. § 300.322(e) ("The public agency must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, *including* arranging for an interpreter." (emphasis added)). Plaintiffs admit as much. *See* Oral Arg. Recording at 14:43–15:48 ("I actually think, your Honor, that we are seeking relief for a component of meaningful participation by parents . . . ."). And as the District Court correctly observed, whether a parent needs a certain translation or interpretation service in order to meaningfully participate requires an individualized inquiry. *See Summary Judgment Op.*, 458 F. Supp. 3d at 289–90.

Plaintiffs' claim also does not implicate policies which undermine access to the administrative hearing process itself. If the non-translation of an IEP, for example, deprives a parent

of the right of meaningful participation, then a parent is still free to pursue administrative procedures to remedy that denial of a FAPE. Of course, this relief cannot be obtained if the parent is unaware that he or she can turn to administrative procedures. Consequently, the most troubling parts of the record before us are indications that some parents in the School District do not receive or cannot access translated versions of the Procedural Safeguards Notice. *See, e.g.*, JA1439 (Perng Decl. ¶ 14) ("I am aware that the District has Procedural Safeguards translated but many parents report to me that they have not received a translated version of this document."); *see also* Br. for *Amici Curiae* Pennsylvania Immigration and Citizenship Coalition et al., 15, 23–25.

But Plaintiffs do not claim that they have been harmed by the School District's failure to provide a translated Procedural Safeguards Notice. Indeed, the only claim from any Plaintiff that is specific to the Procedural Safeguards Notice is from Ms. Perez's declaration that, while the School District does translate the notice and it may sometimes be given to LEP parents, she has not received a Spanish version since her deposition in the instant litigation. Plaintiffs' alleged harms stem from the School District's failure to translate documents like NOREP/PWNs and draft IEPs or provide interpretation services which prevents Plaintiffs from meaningfully participating in IEP Team meetings. *See Class Cert. Op.*, 2019 WL 1745737, at *14 ("[T]he statutory mandate at issue here . . . is the requirement that the School District provide enough language services to allow for 'meaningful participation' by

-30-

parents in the education of their special needs students."). This claim does not meet the systemic exception to exhaustion.

Plaintiffs resist this conclusion by pointing to the fact that the hearing officer for T.R. and A.G. stated that he had "no authority to order wholesale changes in the [School] District's policies or practices." JA134. Under Plaintiffs' conception, exhausting the administrative process is futile because the process cannot result in the Plaintiffs' desired relief of wholesale, systemic changes to the School District's translation and interpretation services. But Plaintiffs misunderstand the import of the hearing officer's decision. The hearing officer was faced with a demand to certify a class at the administrative level and enter relief for all LEP parents in the School District. The hearing officer correctly concluded that he had no authority to find that a policy was a *per se* violation of the IDEA or that a policy resulted in violation for all similarly situated students or parents. If this truism—that administrative hearings cannot order class-wide relief—were sufficient to satisfy the systemic exception, the IDEA's exhaustion requirement would be meaningless every time Rule 23 relief was invoked.

Looking beyond Plaintiffs' class-action overtures, it is clear that they can obtain relief through the administrative process. As the same hearing officer explained, "[i]f a systemic policy or practice yields a violation of an individual student or parent's rights," the hearing officer may "enjoin schools from implementing [the] policy" and "order the [School] District to correct procedural violations." JA134. To put it concretely,

-31-

both Ms. Perez and Ms. Lin could bring the same IDEA claim from their complaint before a hearing officer who could then order that the School District provide each parent with translated IEPs, more qualified or consistent interpretation services, or whatever process would ensure meaningful participation for that parent.[8] Both the claim and the relief would be individualized, even if the relief could create spillover benefits for other LEP parents and thus "could, in theory, provide a universally positive outcome." *Summary Judgment Op.*, 458 F. Supp. 3d at 290.

Plaintiffs failed to exhaust their administrative remedies under the IDEA. Their failure to exhaust cannot be excused by invoking the systemic exception to exhaustion. Thus, the District Court properly concluded that it lacked subject matter jurisdiction as to Plaintiffs' IDEA claim, and we will affirm.

### B. Non-IDEA Claims

Remaining for our review are Plaintiffs' non-IDEA claims for violations of Section 504 of the Rehabilitation Act, the ADA, Title VI of the Civil Rights Act, the EEOA, and Pennsylvania law. As to three of those claims—under the Rehabilitation Act, ADA, and Pennsylvania law—Plaintiffs rely on the same arguments they deployed in opposing summary judgment on their IDEA claim. For the same reasons

---

[8] Indeed, Ms. Lin secured in mediation an agreement with the School District for some translation and interpretation services through the IEP process.

as those set forth above, we will affirm as to these claims.

With respect to the remaining Title VI and EEOA claims, Plaintiffs argue that their claims are not subject to IDEA's exhaustion requirement. Recall that the IDEA's exhaustion requirement applies to claims "under the Constitution, the [ADA], title V of the Rehabilitation Act [including § 504], or other Federal laws protecting the rights of children with disabilities" where the relief sought is the denial of a FAPE. *Fry*, 137 S. Ct. at 750 (alterations in original) (quoting 20 U.S.C. § 1415(*l*)). Whether a suit seeks relief for denial of a FAPE is determined by looking to the gravamen of the complaint, both as a whole and with respect to each individual claim. *See Wellman*, 877 F.3d at 132. Plaintiffs argue that the gravamen of their two claims is for something *other than* the denial of a FAPE.[9] A review of their complaint convinces us

---

[9] Plaintiffs do not suggest that claims under Title VI or the EEOA fall outside the IDEA's exhaustion requirement because those statutes are not "Federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(*l*). Several district courts in this circuit have suggested that because Title VI prohibits racial and national origin discrimination, but not disability discrimination, claims under Title VI do not fall within § 1415(*l*). *See D.C. v. Pittsburgh Pub. Schs.*, 415 F. Supp. 3d 636, 653 n.4 (W.D. Pa. 2019); *Blunt v. Lower Merion Sch. Dist.*, 559 F. Supp. 2d 548, 561 (E.D. Pa. 2008), *aff'd*, 767 F.3d 247, 255, 264 n.28 (3d Cir. 2014) (dismissing cross-appeal on Title VI exhaustion as moot without deciding

otherwise.

The factual allegations in the complaint recount at length how the School District's under-provision of translation and interpretation services has compromised the educational services provided to the members of the Student Class and the meaningful participation rights of members of the Parent Class. Each count, after incorporating these factual allegations, realleges denial of a FAPE under a different guise. In their Title VI count, Plaintiffs assert that the School District's under-provision of translation and interpretation services fails "to ensure meaningful participation by Parent Plaintiffs and members of the Parent Class." JA360 (Compl. ¶ 128). In their EEOA count, Plaintiffs allege that the School District "has impeded equal participation by Student Plaintiffs and the members of the Student Class in the [School] District's special education and other instructional programs." JA359 (Compl. ¶ 125). Furthermore, every count of the complaint requests a common set of declaratory and injunctive relief regardless of the right allegedly violated.

The Plaintiffs fare no better under *Fry*'s suggested inquiries. Clearly, the Plaintiffs could not have brought the same claims—about participation in educational services— against a public theater or library. *See* 137 S. Ct. at 756–57.

merits). Because Plaintiffs contest only the "gravamen" portion of the exhaustion inquiry and have not argued that § 1415(*l*) does not apply, this issue is forfeited and we need not address it.

-34-

Nor could Plaintiffs have brought these claims as mere visitors to a school within the School District. *Id.* In other words, these are "not the sort of claim[s] that would be brought by a nonstudent against a non-school facility." *Wellman*, 877 F.3d at 134. And the history of these proceedings supports the conclusion that Plaintiffs seek to remedy the denial of a FAPE. Original Plaintiffs to the operative complaint had already exhausted administrative remedies for the denial of the FAPE, and the operative complaint still includes in Count One a claim under the IDEA for denial of a FAPE. Both facts cut against Plaintiffs' position. *Cf. Fry*, 137 S. Ct. at 757 ("[P]rior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's complaint concerns the denial of a FAPE, even if the complaint never explicitly uses that term.").

Because the gravamen of Plaintiffs' non-IDEA claims is the denial of a FAPE, those claims are subject to the IDEA's exhaustion requirement. Plaintiffs did not exhaust their administrative remedies and no exception to exhaustion applies. We will therefore affirm the District Court's grant of summary judgment in favor of the School District.

## V. CONCLUSION

Plaintiffs did not pursue the administrative process established by the IDEA for resolving claims of procedural violations and FAPE denials. Because Plaintiffs' IDEA claim does not fit within a systemic exception to exhaustion, we will not excuse such a failure to exhaust. The District Court lacked

jurisdiction to address Plaintiffs' IDEA claim. The District Court also could not decide Plaintiffs' remaining non-IDEA claims because they too sought relief for the denial of a FAPE. With none of Plaintiffs' claims surviving summary judgment, we have no reason to address the inherently procedural questions raised by their class certification motion. We will affirm the orders of the District Court.